# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **ASHLEY K. GRAGG,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No.** |
| | ) | |
| **KNOX COUNTY, TENNESSEE,** | ) | |
| **a governmental entity;** | ) | **JURY DEMANDED** |
| **KYLE W. BOTHOF,** | ) | |
| **individually;** | ) | |
| **JOHN EDGAR,** | ) | |
| **individually;** | ) | |
| **DESIREE MERRITT,** | ) | |
| **individually;** | ) | |
| **THOMAS MILLSAP,** | ) | |
| **individually;** | ) | |
| **JEFFREY BRYANT,** | ) | |
| **individually;** | ) | |
| **HANNAH MOATS,** | ) | |
| **individually;** | ) | |
| **DEANNA JONES,** | ) | |
| **individually; and** | ) | |
| **JOHN and JANE DOES 1-15,** | ) | |
| **individually;** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## COMPLAINT

---

**NOW COMES** the Plaintiff, Ashley K. Gragg ("Plaintiff"), and files this Complaint against the Defendants, Knox County, Tennessee, a governmental entity ("the County"); Knox County Sheriff's Office ("KCSO") Deputy ("Dep.") Kyle W. Bothof, individually ("Dep. Bothof"); KCSO Sgt. John Edgar, individually ("Sgt. Edgar"); KCSO Dep. Desiree Merritt, individually ("Dep. Merritt"); KCSO Dep. Thomas Millsap, individually ("Dep. Millsap"); KCSO Dep. Jeffrey Bryant, individually ("Dep. Bryant"); KCSO Corrections Officer ("CO") Hannah Moats ("CO Moats"); John and Jane Does 1-15 ("Does 1-15") (collectively, "Defendants").

# TABLE OF CONTENTS

I.     NATURE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.   PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       A.    Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       B.    Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IV.    FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

V.     WAIVER OF IMMUNITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

VI.    CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

       COUNT ONE – EXCESSIVE FORCE – 42 U.S.C. §§ 1983 and 1988, Under the
       Fourth and/or Fourteenth Amendments (Against Dep. Bothof and Sgt. Edgar,
       Individually) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

       COUNT TWO – FAILURE TO PROTECT, 42 U.S.C. §§ 1983 and 1988, Under the
       Fourteenth Amendments (Against Dep. Bothof and Sgt. Edgar, Individually) . . . . . . . . 41

       COUNT THREE – DENIAL OF MEDICAL CARE, 42 U.S.C. §§ 1983 and 1988,
       Under the Fourteenth Amendment (Against Dep. Bothof, Sgt. Edgar, Dep. Merritt,
       Dep. Millsap, Dep. Bryant, and John and Jane Does 1-10, Individually) . . . . . . . . . . . 43

       COUNT FOUR – DENIAL OF MEDICAL CARE, 42 U.S.C. §§ 1983 and 1988,
       Under the Fourteenth Amendment (Against CO Moats, LPN Med Supervisor Deanna
       Jones, and John and Jane Does 11-15, Individually) . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

       COUNT FIVE – FAILURE TO TRAIN AND SUPERVISE AS TO DEPLOYMENT
       AND/OR USE OF FORCE POLICY OR CUSTOM CONCERNING K-9
       OFFICERS – 42 U.S.C. §§ 1983 and 1988 under Fourth and/or Fourteenth
       Amendments (Against the County) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

       COUNT SIX – FAILURE TO TRAIN AND SUPERVISE AS TO POLICY OR
       CUSTOM OF FAILING TO PROVIDE MEDICALLY NECESSARY
       PRESCRIPTION MEDICATION TO PRETRIAL DETAINEES – 42 U.S.C. §§
       1983 and 1988 under Fourteenth Amendments (Against the County) . . . . . . . . . . . . . 53

       COUNT SEVEN – BATTERY (Against the County and Dep. Bothof, Individually)
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

COUNT EIGHT – NEGLIGENCE (Against the County, Dep. Bothof, Sgt. Edgar, Dep. Merritt, Dep. Millsap, Dep. Bryant, and John and Jane Does, Individually) . . . . . . 53

COUNT NINE – INTENTIONAL OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS (Against Dep. Bothof, Individually) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

VII.    JURY DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

VIII.   PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

# I. NATURE OF ACTION

1.      Four years ago, Ashley K. Gragg ("Ashley" or "Plaintiff"), 24-years old, was a victim in a horrific car wreck in which she suffered a severe traumatic brain injury requiring an emergency craniotomy. Sadly, her injuries left her with recognizable cognitive impairment. Ashley went through a long period of grueling rehabilitation at the Shepherd Center in Georgia, then returned to Knoxville to complete months of outpatient therapy at the Patricia Neal Rehabilitation Center.  The wreck completely upended young Ashley's life. She developed a medicine-managed seizure disorder, became depressed, and suffered from anxiety.

2.      By March 14, 2024, although still cognitively impaired, Ashley was functioning, driving and doing routine tasks. At a little after midnight on that date, Ashley had gone into the Weigels convenience store on Westland Drive in West Knox County and had returned to her SUV parked near the door. At that moment, Knox County Sheriff's Deputy and K-9 Officer Kyle W. Bothof ("Dep. Bothof") pulled behind Ashley in his patrol vehicle and approached to question her as a suspect in the theft of some yard decorations.[1]

3.      Dep. Bothof tried to explain to Ashley why he was questioning her. Over the course of the next six and a half minutes, Bothof gave a series of commands that would have been confusing to any reasonable person, let alone one facing a 240-pound armed male officer and a vicious attack dog. Still, Ashley did the best she could, simply trying to survive the increasingly inexplicably aggressive actions of Bothof. She was cooperative, but definitely appeared confused, something Bothof later acknowledged but apparently refused to recognize in real time.  Through it all, Ashley gave no indication, verbal or nonverbal, that she intended to flee or run.

---

[1]What followed over the next six minutes is mostly captured on Dep. Bothof's body-camera recording.

4.      Dep. Bothof asked Ashley for her ID, but then eventually backed up and began talking on his radio. Ashley casually turned to open her car door, possibly reaching for her ID. Just a minute and forty seconds after pulling up behind Ashley's SUV, Bothof shouted for her not to get back in the car and – in what he later ridiculously referred to as an effort to de-escalate the situation[2] – unholstered his gun, pointing it at Ashley's head. Ashley immediately complied, shut the door, and stepped away from the SUV. Bothof then approached her. Eight seconds later, Bothof decides to go "hands on," grabs Ashley and slams her up against her SUV. Sixteen seconds after that, as Ashley says "don't kill me" and "don't hurt me," with Bothof gripping her hands behind her back, Bothof threatens to take Ashley to "the God-damned ground," screaming at the scared young woman to "stop resisting." Yet, Ashley was not resisting at all, she was simply trying to survive the terrifying encounter. Even if she was resisting, Ashley's resistance was passive, at most.

5.      Eight seconds later, as he has both of Ashley's hands pulled behind her back, Dep. Bothof threatens to call for his dog to attack Ashley. Thirty seconds later, Bothof slams Ashley hard to the ground, her face and left knee hitting the pavement. Soon after, Bothof is on Ashley's back, pushing her down with his 240-pound frame, holding her with his right hand. Bothof has both of Ashley's arms pulled behind her back as she lies face-down on the pavement.

6.      For forty seconds, Ashley was face-down on the pavement with her arms pulled behind her back. Dep. Bothof says, "you're going to get fucking tased," as he pressed on her neck and pulled on her hair. As Bothof stands, he still has hold of Ashley's left arm, as she's crying, begging him to stop hurting her.

---

[2]Dep. Bothof conceded at Ashley's preliminary hearing that there is no training or policy that says pulling a handgun de-escalates a situation.

7.     Still holding onto Ashley's arm as she sits on the pavement – unarmed and making no effort to run or flee, and with the siren of his backup clearly audible, Dep. Bothof nevertheless deemed it necessary to summon his K-9 partner, "Dolly," a specially-trained Belgian Malinois attack dog. Dolly appears and Bothof directs her toward Ashley. Immediately, Dolly sunk her teeth deep into the flesh of Ashley's left thigh, clamped her jaws shut, and began shaking her head repeatedly. For the next eighty-one (81) seconds, Dolly mauls Ashley as the young woman lies on her back on the pavement screaming in agony, crying for help.

8.     Sgt. John Edgar, Dep. Bothof's supervisor, arrives after Dolly had been gnawing on Ashley's leg for about thirty seconds and plants his knee into Ashley's back, as the dog continues to bite Ashley. Edgar directs Bothof to "get the dog off her," and a few seconds later, Bothof gives his first command for Dolly to "leave it."  But Dolly, too riled and excited from being let out of the patrol vehicle, ignores the command. Even though Ashley is now restrained by two officers who have her face-down on the pavement, Bothof decides that Edgar should handcuff Ashley *before he releases the dog from mauling her*. It takes Edgar about 40 seconds to place the cuffs on. Meanwhile, Dolly continues attacking Ashley for another 10 seconds.

9.     Finally – after drawing his gun on Ashley, slamming her against the SUV, throwing her violently face-first onto the pavement, manhandling her with Sgt. Edgar, having her mauled by his vicious attack dog for 81 seconds, mostly as Ashley was under control or subdued face-down on the pavement – Dep. Bothof is able to get the dog off Ashley, as bits of Ashley's mangled thigh liter the pavement around her. Within seconds, the parking lot is filled with additional county officers, including a SWAT team, all of whom mill about, as Ashley lays or sits unattended for over an hour without any form of aid or medical care.

10.     Ultimately, nearly two hours later, Ashley is transported to the University of

Tennessee Medical Center ("UTMC") Emergency Department, where her wound is cleaned and dressed and she's given a strong antibiotic to prevent infection. The ER doctor provide the KCSO officers who accompanied Ashley with her discharge papers, a printed prescription for a five-day regimen of the antibiotic, Augmentin, and medical instructions, including the directive that she have another antibiotic hours later.

11.     Ashley was next transported to the Roger D. Wilson Detention Facility, where jail and medical staff, including CO Hannah Moats and LPN Medical Supervisor Deanna Jones among others, ignored the ER doctor's clear instructions for Ashley's immediate care, never had her examined by a doctor for alternative treatment, never dispensed a second Augmentin pill to Ashley, likely never filled the prescription, and then failed to provide the printed prescription to Ashley when she was ultimately released from jail. Within a week, beset by the bacteria that had entered the wound and began growing as she sat in a cell, and having missed the next rounds of Augmentin, the bite-wounds became infected.

12.     Bothof's actions left Ashley with severe lacerations, puncture wounds, permanent scarring, persistent muscle damage, and other impairments. Eventually, Ashley would have multiple surgeries, including skin grafts, to repair the damage caused by the horrific dog bite, and her medical bills would exceed $454,000. Even now, she continues to suffer serious and long-term mental and emotional consequences.

13.     In addition to the constitutional claims of excessive force, failure to protect, and denial of medical care, and state common law claims alleged herein, Ashley also challenges the County's policy or custom that permitted Dep. Bothof to deploy Dolly in the first place on an unarmed and non-dangerous suspect who was face-down on the ground, in the officer's grasp, and generally under the officers' control, as well as Knox County's policy or custom of knowingly or

-4-

recklessly depriving pretrial detainees like Ashley, who suffered from an obvious and serious medical injury, of medically necessary prescriptions.

14. Defendants, acting under color of law, deprived Ashley of her constitutional rights under the Fourth and/or Fourteenth Amendments. By this action, she makes the following specific claims:

> Count One – Excessive Force – 42 U.S.C. §§ 1983 and 1988, under Fourth and/or Fourteenth Amendments, for multiple uses of excessive force against Ashley (Against Dep. Bothof and Sgt. Edgar, Individually);

> Count Two – Failure to Protect, 42 U.S.C. §§ 1983 and 1988, under Fourth and/or Fourteenth Amendments (Against Dep. Bothof and Sgt. Edgar, Individually);

> Count Three – Denial of Medical Care, 42 U.S.C. §§ 1983 and 1988, under the Fourteenth Amendment (Against Dep. Bothof, Sgt. Edgar, Dep. Merritt, Dep. Millsap, Dep. Bryant, and John and Jane Does 1-10, All Individually);

> Count Four – Denial of Medical Care, 42 U.S.C. §§ 1983 and 1988, under the Fourteenth Amendment (Against Co Moats, LPN Med Supervisor Deanna Jones, and John and Jane Does 11-15, Individually);

> Count Five – Failure to Train and Supervise as to Deployment and Use of Force Policy or Custom Concerning K-9 Officers – 42 U.S.C. §§ 1983 and 1988 under Fourth and/or Fourteenth Amendments (Against the County);

> Count Six – Failure to Train and Supervise as to Policy or Custom of Failing to Provide Medically Necessary Prescription Medication to Pretrial Detainees – 42 U.S.C. §§ 1983 and 1988 under Fourteenth Amendments (Against the County);

> Count Seven – Battery (Against the County and Dep. Bothof, Individually);

> Count Eight – Negligence (Against the County, Dep. Bothof, Sgt. Edgar, Dep. Dep. Merritt, Dep. Millsap, Dep. Bryant, and John and Jane Does 1-10, All Individually); and

-5-

Count Nine – Intentional or Reckless Infliction of Emotional Distress
(Against Dep. Bothof, Individually).

15.     Plaintiff, Ashley K. Gragg, seeks all compensatory damages available to her, including, but not limited to, damages for (a) bodily injury, (b) excruciating physical pain and suffering; (c) economic damages, including over $464,000 in medical charges, and (d) severe emotional suffering, mental anguish, humiliation, despair, and hopelessness. She further requests punitive damages against Knox County and Dep. Bothof, as well as attorney's fees, costs, expenses, and all other appropriate relief.

## II.   JURISDICTION AND VENUE

16.     This civil action is brought to redress alleged deprivations of constitutional rights as protected by 42 U.S.C. §§ 1983, 1988, and the Fourth and Fourteenth Amendments of the United States Constitution, and for Tennessee common law torts. Original jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343.

17.     This Court also has supplemental jurisdiction over any claims brought under Tennessee law, pursuant to 28 U.S.C. §1367, as such claims are so related to claims in the action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the Constitution.

18.     Venue is proper in this Court under 28 U.S.C. § 1391(b), as all incidents, events, and occurrences giving rise to the action occurred in Knox County, within the Northern Division of the Eastern District of Tennessee.

-6-

### III. PARTIES

**A.      Plaintiff**

19.      At all times material, Ashley K. Gragg ("Ashley" or "Plaintiff") was a citizen and resident of Knox County, Tennessee.

**B.      Defendants**

20.      Defendant, Knox County ("County") is a governmental entity and political subdivision of the State of Tennessee, duly organized. It may be served through its chief executive officer, Knox County Mayor Glenn Jacobs, Mayor's Office, City County Building, Suite 615, 400 Main Street, Knoxville, TN 37902.

21.      The County possesses the power and authority to adopt policies and prescribe rules, regulations, and practices affecting all facets of the training, supervision, control, employment, assignment, and removal of individual members of the KCSO, and to assure that actions, policies, rules, regulations, practices and procedures of the KCSO and its employees comply with the laws and constitutions of the United States and Tennessee.

22.      The County is also responsible for training and certifying its law enforcement employees, including K-9 officers and their partners, and implementing procedures and protocols to honor and respect the Due Process rights of citizens with whom its law enforcement employees interact.

23.      In this case, the County and the KCSO acted through their agents, employees, and servants, including policymakers like Sheriff Spangler. At all times material hereto, these policymakers, including Sheriff Spangler, were operating under color of law.

24.      At all times material hereto, Sheriff Spangler was the duly elected Sheriff, responsible for the screening, hiring, firing, training and the supervision of KCSO employees.

-7-

25.      At all times material hereto, Sheriff Spangler also possessed the power and authority and was charged by law with the responsibility to enact policies and to prescribe rules and practices concerning the use of force, including the use of K-9 officers and partners and other force-options, by KCSO deputies. He was further authorized to make policy or establish customs concerning the dispensation of medically necessary prescription medication by medical and other jail personnel at the Roger D. Wilson Detention Facility.

26.      At all material times, Dep. Kyle W. Bothof ("Dep. Bothof") was employed by the KCSO as a deputy. Bothof has been a K-9 officer for three years. Bothof is sued in his individual capacity and as principal on his official bond. At all relevant times, Bothof was operating under color of law. Bothof is, upon information and belief, a citizen and resident of Knox County and may be served with process at the KCSO, 400 W. Main St., Knoxville, TN 37902.

27.      At all material times, Sgt. John Edgar ("Sgt. Edgar") was employed by the KCSO as a patrol supervisor. Edgar is sued in his individual capacity and as principal on his official bond. Edgar was the second officer on the scene at the Weigels and arrived as Bothof's K-9 partner, Dolly, was attacking the Plaintiff. At all relevant times, Edgar was operating under color of law. Edgar is, upon information and belief, a citizen and resident of Knox County and may be served with process at the KCSO, 400 W. Main St., Knoxville, TN 37902.

28.      At all material times, Dep. Desiree Merritt ("Dep. Merritt") was employed by the KCSO as a deputy. Merritt is sued in her individual capacity and as principal on her official bond. At all relevant times, Merritt was operating under color of law. Merritt is, upon information and belief, a citizen and resident of Knox County and may be served with process at the KCSO, 400 W. Main St., Knoxville, TN 37902.

-8-

29.     At all material times, Dep. Thomas Millsap ("Dep. Millsap") was employed by the KCSO as a deputy. Millsap is sued in his individual capacity and as principal on his official bond. At all relevant times, Millsap was operating under color of law. Millsap is, upon information and belief, a citizen and resident of Knox County and may be served with process at the KCSO, 400 W. Main St., Knoxville, TN 37902.

30.     At all material times, Dep. Jeffrey Bryant ("Dep. Bryant") was employed by the KCSO as a deputy. Bryant is sued in his individual capacity and as principal on his official bond. At all relevant times, Bryant was operating under color of law. Bryant is, upon information and belief, a citizen and resident of Knox County and may be served with process at the KCSO, 400 W. Main St., Knoxville, TN 37902.

31.     At all material times, CO Hannah Moats ("CO Moats") was employed by the KCSO as a corrections officer at the Roger D. Wilson Detention Facility. Moats is sued in her individual capacity and as principal on her official bond. She performed the intake screenings on Ashley at the Detention Facility. At all relevant times, Moats was operating under color of law. Moats is, upon information and belief, a citizen and resident of Knox County and may be served with process at the Roger D. Wilson Detention Facility, 5001 Maloneyville Rd, Knoxville, TN 37918.

32.     At all material times, LPN Medical Supervisor Deanna Jones ("Nurse Jones") was employed by the KCSO as a nurse and medical supervisor at the Roger D. Wilson Detention Facility. She examined Plaintiff on March 14, 2024 and failed to dispense antibiotics to her prior to her release and to insure that Plaintiff obtained her printed prescription for Augmentin, which appears to have been in her possession or control. Jones is sued in her individual capacity and as

-9-

principal on her official bond. At all relevant times, Jones was operating under color of law. Jones is, upon information and belief, a citizen and resident of Knox County and may be served with process at the Roger D. Wilson Detention Facility, 5001 Maloneyville Rd, Knoxville, TN 37918.

33.     Plaintiff also sues the fictitious Defendants, John and Jane Does 1-15, as their identities and/or capacities and/or other facts showing their specific culpability are presently unknown.[3] Plaintiff has made numerous attempts, through her attorneys and otherwise, to obtain information from the county via public records requests and other communications that would be sufficient for her to identify other officers or medical staff who failed to protect her or denied her medical attention and their involvement in same, to no avail.

34.     These unidentified Defendants are sued in their individual capacities as Knox County officers or Detention Facility medical or corrections staff and as principals on their official bonds.[4] They include unknown officers who denied Plaintiff aid or medical care or committed other unconstitutional actions against her at the Weigels' parking lot or at the Detention Facility.

35.     Various persons not made Defendants, including County or KCSO officials, may have participated in violations asserted herein and performed acts or made statements in furtherance thereof. Ashley reserves the right to name some or all of these persons as Defendants, as their identities become known.

---

[3]While the names of three KCSO officers – Desiree Merritt, Thomas Millsap, and Jeffrey Bryant – are listed in the February 2025 indictment (likely as having been at the scene and possibly accompanying Ashley to UTMC and transporting her to the Detention Facility), Plaintiff has little reliable information about their specific involvement at this time.

[4]Under Rules 4(m) and 15(c) of the Federal Rules of Civil Procedure, Plaintiff will seek leave of Court to amend her Complaint to set forth the true names and capacities of such Defendants, when and if their identities are ascertained.

## IV. FACTUAL ALLEGATIONS

### A. Ashley Suffered a TBI That Left Her Cognitively Impaired

36.     On October 26, 2020, Ashley K. Gragg had just turned 25 years old. The diminutive young woman stood 5'2" and weighed about 110 pounds. By all accounts, Ashley was bright and happy and had a full and rich life ahead of her. But on that day, she was the victim of a serious car wreck and suffered a severe traumatic brain injury ("TBI"), leading to a right posterior temporal contusion, right temporal epidural hematoma, and left temporal subdural hematoma. Ashley had to undergo an emergency craniotomy. In the end, Ashley suffered significant cortical encephalomalacia on the left posterior temporal lobe and right posterior temporal region. Ashley consequently suffered cognitive impairment.

37.     Following hospitalization, Ashley underwent extensive rehabilitation at the Shepherd Center in Georgia, followed by outpatient therapy at the Patricia Neal Rehabilitation Center in Knoxville. As a result of the TBI, Ashley also now suffers from epileptic seizures, which are treated by twice-daily doses of lamotrigine. These include periods of staring, unresponsiveness, and tonic-clonic seizures, lasting for a minute or two, also characterized by a period of fatigue and confusion for hours.

### B. Ashley Encounters Dep. Kyle W. Bothof

38.     At a little after midnight, on March 14, 2024, a citizen called E-911 of Knox County to report a female driver who was stealing yard ornaments and furniture from various yards. The citizen, Elizabeth Gallagher, followed the driver to the Weigels convenient store at 9710 Westland Drive.

39.     According to Dep. Bothof's incident report, Gallagher had allegedly observed a silver Mercedes-Benz SUV stop in front of her neighbor's residence, at which time a white female had

-11-

exited the vehicle, took packages off the doorstep, and placed them in her vehicle. The suspect allegedly repeated this at another neighbor's residence.[5] Gallagher, with her 15-year old daughter accompanying her, began following the vehicle, observed the license plate, and notified E-911. At the Weigels, the alleged suspect parked and went into the convenient store.

40.     Dep. Bothof testified at a preliminary hearing on Ashley's criminal charges in August 2024 and stated there was no indication from dispatch that the suspect was armed or dangerous.

41.     Dep. Bothof pulls his patrol vehicle into the Weigels behind a silver Mercedes SUV.[6]

42.     Dep. Bothof activates the audio on his body-camera and says, "Hello" to Ashley, as she stands at the door of her vehicle parked in front of Weigels. Ashley responds, "Hi."[7]

43.     Dep. Bothof asks Ashley if she had just come off Garrison Ridge. She told him that she was on her way to babysit nearby for a friend.[8]

---

[5]Dep. Bothof later reported that the stolen items (*e.g.*, mail, an outdoor mat, planter, and lawn chair) were valued at approximately $300.00. One alleged theft victim didn't even bother to get his property back, stating that, "it wasn't worth the time."

[6]*See* Video (Exhibit 1), to be manually filed, 12:17:46 a.m. The times referenced are from the date/time stamp on the top right-hand corner of the video, signifying the date, March 14, 2024 ("2024-03-14") and time ("00:17:22").

[7]*See* Video, 12:17:52 a.m.

[8]*See* Video, 12:17:56. In his incident report, Dep. Bothof stated that when he "made contact with [Ashley]," he detected "a strong odor of alcoholic beverage coming from her person" and she was "unsteady on her feet with bloodshot-glassy eyes." Yet, the video confirms that there is no mention of alleged intoxication whatsoever until well after the incident when Bothof is attempting to drum up charges for Ashley. Bothof hears another officer comment that he believed she was "drunk." At 12:34:27 of the video, an unidentified officer says, "she's drunk! You can smell it. Yeah, she's drunk. Now is there something else involved? Possibly. You can definitely smell it." Surprised, Bothof responds: "Oh, is she? Sweet. Sweet!" Moreover, no field sobriety tests or blood draw was attempted or performed at the scene or sought at UTMC.

-12-

44.    Dep. Bothof tells Ashley to step away from her vehicle and asked her if she had taken any "yard decorations or anything like that."[9]

45.    Dep. Bothof next tells Ashley that they had received a call and her vehicle matched the description and tag number of the subject vehicle and that she had been "stealing yard decorations" Ashley denied doing so and told the deputy she needed to go babysit and asked if she could just give him her address and talk later.[10]

46.    Dep. Bothof tells Ashley to pull her hands out of her pocket. Ashley responded, "I don't have nothing in my pocket."[11]

47.    Ashley told Dep. Bothof that she had to go, and offered to give him her address. Bothof said, "no, we're going to figure all this out right now." Ashley said "okay," and asked, "so, what's up"? Bothof asked, "do you have ID with you." Ashley replied, "yeah, what's up, though?" Bothof said, "I just explained everything to you." Ashley replied, "but I have to go."[12]

48.    Dep. Bothof responded, "but you're not free to leave." She said, "you can literally follow me home."[13] Bothof responded, "you're detained . . . for a possible theft . . . . Did you not hear everything I just said."[14]

---

[9]*See* Video, 12:18:17 a.m.

[10]See Video, 12:18:19-43. Dep. Bothof testified at a preliminary hearing that "[Ashley] kept acting confused." This is possibly because of the effects of the brain injury Ashley suffered.

[11]*See* Video, 12:18:22 a.m.

[12]*See* Video, 12:18:45-12:19:07.

[13]*See* Video, 12:19:09-12.

[14]*See* Video, 12:19:12-20.

-13-

**C.** **Dep. Bothof Draws His Gun and Points It at Ashley's Head**

49. As Dep. Bothof stepped back and began talking on his radio, Ashley walked to her vehicle's front door and started to open it, conceivably to grab her ID from her purse.[15] Notably, at this point, before this point, Bothof had not informed Ashley that she could not get her wallet out of her purse, or get into her car.

50. As Ashley starts to open the car door, Dep. Bothof says, "don't go back in the car." As Ashley cracked the car door open by a few inches, Bothof, with no warning, drew his service weapon, pointed it at Ashley's head, and shouted, "don't go back in the fucking car, put your hands up."[16] Ashley immediately closed the door and begged Bothof, "don't hurt me, don't hurt me."[17]

51. Dep. Bothof shouted, "get your hands over here," as Ashley pulls her hands up to her face and withdrawing up against her vehicle, afraid she was about to get shot.[18]

**D.** **Dep. Bothof Goes Hands-On To Handcuff An Unarmed Female**

52. Having re-holstered his weapon, Dep. Bothof next grabs Ashley, spins her around to where she's facing her SUV, pulls her wrists and arms behind her back, and smashes her face-first and hard up against her vehicle, telling her to get her hands up, as he's holding them behind her

---

[15] *See* Video, 12:19:29.

[16] *See* Video, 12:19:30-36.

[17] *See* Video, 12:19:36.

[18] *See* Video, 12:19:38.

-14-

back, as Ashley continues to plead, "please don't hurt me, don't hurt me. . . . .please, no, please . . . ."[19] At Ashley's preliminary hearing, even Bothof conceded that his commands to Ashley were often confusing and misleading.

53.     Dep. Bothof begins shouting, "stop resisting, or you're gonna go on the God-damned ground." Bothof says, "does that make sense?" as he bullies the brain-injured 20-year old woman. Ashley says, "I'm not resisting." Bothof repeatedly shouts "stop resisting. I'm putting you in handcuffs, so stop resisting." Ashley responds, "I'm not resisting, please.'"[20]

54.     Over the next 25 seconds, Dep. Bothof keeps telling Ashley to "stop resisting, or you're going to be put on the ground or I can let my dog out of the car." Ashley continues to plead, "Please don't hurt me." The deputy shouts again, "I will put you on this damned ground." Ashley says, "stop, you're hurting me."[21]

55.     Dep. Bothof orders Ashley to "go to the ground. . . . Quit moving your hands."[22] To be sure, the video does not show Ashley moving her hands at all. It is likely that Bothof having pulled her arms tightly behind her back, she was in pain and any movement was simply a reflex.[23]

**E.     Dep. Bothof Takes Ashley, Unarmed and Non-Dangerous, to the Ground**

56.     As he had threatened, Dep. Bothof next slams Ashley face-down onto the pavement, and by 12:20:43 a.m., Ashley is on the ground, crying and crawling, as Bothof begins to pull at

---

[19]*See* Video, 12:19:40-52.

[20]*See* Video, 12:19:57-12:20:00.

[21]*See* Video, 12:20:00-12:20:25.

[22]*See* Video, 12:20:26.

[23]At the preliminary hearing on Ashley's state charges, Bothof confirmed that he had radioed dispatch that he was "Code J," meaning he was not in distress.

-15-

Ashley's hair. Ashley's left arm is being twisted by Bothof behind her back, her right arm is stretched above her head, but is lying on the pavement.[24]

57.     Gripping Ashley's left arm, Dep. Bothof screams "get your hand behind your back, now!" By 12:20:48 a.m., Bothof has grabbed Ashley's right wrist and has pulled it behind her back as well. Ashley says, "you're hurting me" and Bothof responds, "quit resisting me," as he holds both of Ashley's wrists tightly all the way behind her back.[25]

58.     Dep. Bothof says, "quit resisting me or I'm letting my dog out of the car."[26]

59.     Forty seconds after being thrown to the pavement, Ashley's hands are firmly pulled behind her, but Dep. Bothof still hasn't handcuffed her.[27]

60.     Dep. Bothof pulls out his handcuffs, as Ashley draws up into a fetal position on the pavement, as Bothof shouts, "you're going to get fucking tased."[28]

61.     Dep. Bothof has hold of Ashley by her hair and a wrist, telling her to put her hands behind her back, then has hold of Ashley's neck, shouting, "put your hands behind your back."[29]

---

[24]*See* Video, 12:20:43-12:20:45. In his report, Dep. Bothof reported that he "placed [Ashley] on the ground to better control her movements," and she "began fighting me on the ground, refusing to place her hands behind her back, and continued to forcefully pull her hands away to her front side to avoid being placed in handcuffs." Notably, the video does not validate this version of the incident. The fact is, Ashley had gained a significant amount of weight since suffering the TBI three and a half years earlier and it was simply hard physically for her to put her hands all the way behind her back to be handcuffed.

[25]*See* Video, 12:20:49-12:21:03.

[26]*See* Video, 12:21:03.

[27]*See* Video, 12:21:22.

[28]*See* Video, 12:21:25.

[29]*See* Video, 12:21:31-34.

-16-

62.     Dep. Bothof again threatens to get his dog out, saying "I'm letting my dog out of the car."[30]

63.     By now, Dep. Bothof has both hands on Ashley's now bare back, as her top had become pulled up toward her head. Ashley again pleads with Bothof, "please."[31]

64.     Ashley rolls over on her side, sobbing, as it appears Dep. Bothof is dragging her on the pavement by her left wrist.[32]

65.     Ashley says, "get off me." Dep. Bothof responds, "put your hands behind your God-damned back." Ashley responds, "you're hurting me," as Bothof keeps pulling and twisting on her left arm.[33]

66.     Ashley says, "why are you yelling?" Meanwhile, Dep. Bothof is pulling on her left wrist, as he looks at the remote which will pop the door open and let his dog out.[34]

67.     As Ashley is on the pavement on her knees, Dep. Bothof gripping her left arm, he says, "you're about to be dog bit." Ashley says, "don't yell at me and don't hurt me." Bothof shouts "get on the ground."[35]

---

[30]*See* Video, 12:21:38.

[31]*See* Video, 12:21:40.

[32]*See* Video, 12:21:48.

[33]*See* Video, 12:21:57.

[34]*See* Video, 12:22:05.

[35]*See* Video, 12:22:08.

-17-

**F.    Dep. Bothof Deploys His K-9 to Attack Ashley as She Lies Face-Down on the Pavement As He Holds One of Her Arms.**

68.    At this point, a siren can be heard on the body-cam recording, approaching the Weigels' parking lot. Two seconds later, with backup nearly in the parking lot, Dep. Bothof yells for his K-9, "Dolly!" At this particular moment, Ashley is lying flat on her back on the pavement. Bothof has his knee on her back. The K-9, "Dolly," a specially-trained Belgian Malinois, appears and jumps up at Bothof, who immediately directs her to Ashley.[36]

69.    When Dolly ran to where Dep. Bothof was standing, Bothof was holding onto Ashley's outstretched left hand and arm with both of his hands. He directed Dolly toward Ashley, as Dolly started clamped down on Ashley's thigh, Bothof, with a tight grip on Ashley's left arm, continued shouting, "put your hands behind your back, put your hands behind your back, put your hands behind your back, right now!"[37]

70.    Dep. Bothof reported that he deployed his K-9 from his police cruiser "to aid in apprehending [Ashley]." Yet, Ashley had made no attempt to flee, in her car or on-foot.[38]

---

[36]*See* Video, 12:22:16-12:22:23. Obviously, it was impossible for Ashley to comply with Dep. Bothof's commands. First, he had a hold on Ashley's outstretched arm and she could not very well put it anywhere. Second, at that moment, Dolly, his K-9, had bitten down on Ashley's thigh, gnawing on her as the dog's head shook and jerked back and forth. Third, like any human, Ashley's instincts were not to listen to Bothof, but to try to survive and protect herself from Bothof and the dog who was mauling her.

[37]*See* Video, 12:22:16-12:22:23.

[38]It is ridiculous, if not embarrassing, for Dep. Bothof to seriously suggest that a 240-pound Sheriff's deputy, presumably in good physical condition, armed with a Taser, possibly a baton, not to mention a gun, needed to deploy an attack dog to "apprehend" a 5'2" young woman whom he had face-down on the pavement as he held onto one of her arms.

-18-

71.     Dolly viciously bites down into Ashley's left thigh, as Ashley lies on her back on the pavement, writhing in pain from the dog's violent jerking and tearing of her flesh.[39]

72.     For about twenty seconds, Dep. Bothof inexplicably continues to scream over and over again at Ashley to put her hands behind her back, as the dog continues clamping down on Ashley's thigh, and Ashley is jerked around by the dog, and by Bothof, who now has grabbed onto her hair.[40]

73.     At this point, Ashley is again face-down on the pavement, as the dog continues to bite and jerk on Ashley's thigh. As the dog continues to bite into her thigh, Ashley's black tights have been pulled down below her buttocks. Dep. Bothof screams "I'm trying to tell you put your hands behind your back!" Bothof again grabs Ashley's hair and pulls it, as she attempts to cover up her head.[41]

### G.     Sgt. Edgar Arrives and Gets on Top of Ashley's Back as She's Face-down on the Pavement.

74.     Sgt. John Edgar, who just arrived and is Dep. Bothof's supervisor, tells Bothof, "Get the dog off. Get the dog off of her!"[42] A second later, as Ashley lies with her face buried against the pavement, Bothof reaches and grabs the dog's collar.[43]

---

[39] *See* Video, 12:22:23-25.

[40] *See* Video, 12:22:24-12:22: 45.

[41] *See* Video, 12:22:45-12:22:51.

[42] *See* Video, 12:22:52.

[43] See Video, 12:22:53-55.

-19-

75.     Sgt. Edgar comes into view, putting his knee into Ashley's back as she remains face-down on the pavement. The dog continues to bite into and jerk Ashley's thigh, as Ashley pleads for help.[44]

76.     Dep. Bothof orders Dolly to "leave it" and pulls on her collar to get her off of Ashley, but the dog continues to bite and viciously jerk at Ashley's thigh.[45]

77.     Sgt. Edgar, with his knee on Ashley, shouted to Dolly: "Let go of that leg, let go of that leg!" But Dep. Bothof says, "cuff her first," as the dog keep gnawing on Ashley's leg.[46]

78.     Sgt. Edgar then shouts, "get Dolly off of her!" Ashley yells, "oh my God, help me!"[47]

79.     Seconds later, as two male Knox County deputies stand over Ashley, she lies face-down on the pavement, the dog still biting and refusing to let go of her thigh, jerking it in a back and forth motion. Dep. Bothof says, "put your hands behind your back and I'll take her off."[48]

80.     The dog is still gnawing on Ashley's thigh, as Sgt. Edgar kneeled down onto Ashley's back to handcuff her. Seventy seconds after Dolly first made contact with Ashley's thigh, she continues to bite her. Sgt. Edgar has Ashley in handcuffs, subdued on the payment. Bothof again shouts "quit resisting."[49]

---

[44] *See* Video, 12:22:53-57.

[45] *See* Video, 12:23:01.

[46] *See* Video, 12:23:04-12:23:07.

[47] *See* Video, 12:23:08-12:23:14.

[48] *See* Video, 12:23:15-12:23:18.

[49] *See* Video, 12:23:33.

81.     Even if, arguendo, Ashley ever was a threat (and she was not), she was clearly not a threat at this point. Yet, the dog continued biting into Ashley's thigh for another ten seconds after Sgt. Edgar had handcuffed her, and neither Edgar nor Dep. Bothof did anything to stop her.[50]

**H.     Dolly Mauls Ashley for a Total of 81 Seconds, Even Though Ashley Is under Control and Not a Threat.**

82.     Dolly mauls Ashley for 81 seconds, fully 52 seconds after Dep. Bothof had first tried to call her off, and after Sgt. Edgar, Bothof's supervisor, directed him to get the dog off of Ashley. Bothof can be hard saying, "good dog" to Dolly.[51]

83.     Dep. Bothof had commanded Dolly to release from Ashley no fewer than three times over forty-four seconds before she actually let go of Ashley's leg.

84.     Ashley was charged with theft, resisting, and DUI. On February 26, 2025, she was indicted for those offenses, as well as the additional offense of "assault."

**I.      As Tissue from Ashley's Thigh Spills onto the Pavement and a Dozen or More Officers Mill About, No One Renders Ashley Any Aid or Summons an Ambulance for Her for More Than an Hour, When She Is Finally Taken by Ambulance to UTMC ER.**

85.     After Dolly released, numerous officers mill about, with Dep. Bothof trying to explain what happened, acknowledging the trivial nature of the stop ("she supposedly stole some stuff from a neighborhood. That's it."). Meanwhile, Ashley sat on the pavement – unattended by EMS or other medical personnel for over an hour. Neither Dep. Bothof nor Sgt. Edgar had told dispatch that Ashley had tissue hanging out of her thigh and was suffering from a severe injury.

---

[50]*See* Video, 12:23:45.

[51]*See* Video, 12:23:45-55.

86.     After several minutes, Ashley pleads for someone to pull her pants up as she lies on the pavement. Ashley cries out in pain as officers smile and laugh around her, and says "It hurts so bad."[52]

87.     An unknown officer asks Bothof, "hey, did you have to pop the door?" Bothof responds, "yeah, I had her on the ground, had my knee on her back, I'm like you're gonna get dog bit, and finally I just like frickin popped it."  An unknown officer says, "it feel good?" Bothof responds: Yeah! That's the first time it's ever happened!"[53]

88.     Dep. Bothof told another officer that this had been the first time he had ever "popped" the door to let Dolly out to attack someone.[54]

89.     When Ashley saw Bothof, she told him that he had hurt her. He responded that he had "every authority to do that."[55]

90.     An hour and fifteen minutes after the incident, an ambulance had not been requested.[56] But Ashley has fatty tissue hanging out of her leg.[57]

91.     Dep. Bothof radios dispatch: "would you let AMR know that there is a severe laceration to this woman's leg."[58]

---

[52]See Video, 12:25:27-32.

[53]See Video, 12:31:32.

[54]See Video, 12:35:20

[55]See Video, 1:05:59.

[56]See Video, 1:20:20.

[57]See Video, 1:22:30.

[58]See Video, 1:21:41.

-22-

92.     Dep. Bothof remarks to another officer, "we just went a little crazy and we didn't have to."[59]

93.     Finally, at almost 1:30 a.m., over an hour after the incident, an ambulance appeared and twelve minutes later, began putting Ashley into the ambulance.[60]

94.     A few minutes later, well over an hour after the dog-bite, Dep. Bothof acknowledges on the radio, "she's going to have to go to the hospital. It's not puke light we thought. It's fatty tissue."[61]

95.     Before leaving Weigels, Dep. Bothof goes into the Weigels to ask if they have the video footage of everything that had happened. The clerk says to call corporate for it. His response: "I just wanted to see my dog bite her. (chuckles) I just wanted to see it from a different point of view. I told her what was gonna happen."[62]

**J.      Ashley Is Treated and Given a Strong Antibiotic at UTMC ER**

96.     Ashley's UTMC medical records indicate that she was admitted to the ER at 2:15 a.m., given an initial assessment at 2:30 a.m.

97.     The dog-bite wound was on Ashley's left lateral proximal thigh and encompassed several half-inch lacerations, as well as abrasions and bruising to the entire thigh. The ER doctor, Jeffrey W. Cloyd, M.D., noted that her transport had been delayed on scene "because the officers didn't know which hospital she should go to."

---

[59]*See* Video, 1:24:55.

[60]*See* Video, 1:27:15.

[61]*See* Video, 1:33:15.

[62]*See* Video, 2:03:28.

98.     At UTMC ER, at 2:33:19, a second officer's body-cam video shows an ER doctor telling Ashley, "this will be a pretty quick stay here in the emergency room. We've got to clean this out. . . . we don't sew dog bites back together because they're puncture wounds so the bacteria go in and if we sew em closed the bacteria can't come out."

99.     The ER doctor informed Ashley that there was no benefit to suturing the laceration, as it would only increase her potential risk for an infection. The ER doctor told Ashley, "Ultimately, you're going to go home with a prescription for Augmentin, which is an antibiotic to try to help prevent an infection. These actually get infected pretty common. Something about the thigh. We're not really sure why. But we want to make sure it doesn't get infected."

100.    The doctor says, "We're going to give you a dose of antibiotic here because it sounds like you won't be going straight to the pharmacy when you leave here."

101.    The wound was cleaned and Ashley was treated with Augmentin, a strong antibiotic, in the ER. She was also given a dose of her anti-seizure medication, lamotrigine 100 mg, Ibuprofen, for pain, and given a tetanus booster. Ashley was discharged with a prescription for Augmentin twice daily for 5 days, as prophylaxis.

102.    At 3:01 a.m., a body camera recording from one of the officers, presumably Desiree Merritt, who accompanied Ashley to UTMC, reveals a UTMC nurse giving Ashley Augmentin and Ibuprofen.[63]

**K.      Ashley Is Discharged From UTMC and Transported to Jail**

103.    Ashley was discharged from the UTMC ER at 3:31 a.m. Discharge information, including information about Ashley's antibiotic prescription and wound care, was provided to one

---

[63]This video will be manually filed as Exhibit 2.

of the two officers who accompanied Ashley to the ER. The information indicated that the ER doctor had provided a printed prescription for Augmentin 875 mg-125 mg (oral tablet), with instructions to take one tablet orally "every 12 hours" for "5 days."

104.    Printed material was also provided to the officers to indicate the treatment for the wound and discussing the need for surgery if infection occurred. The instructions made clear that taking the antibiotic, exactly as prescribed, was crucial to prevent infection. All this information was also given to Jail medical staff, as it appears in Ashley's jail medical file.

105.    From UTMC, Ashley was transported by two KCSO deputies to the Roger D. Wilson Detention Facility to be processed and booked.

106.    When Ashley arrived at the Detention Facility, she was triage in the sallyport, which indicated that she had a "K-9 bite" to the upper left leg. The notes stated that Ashley was "holding left foot off ground, appears to be in pain  discharge paperwork utmc er reads 'dog bite' ace wrap covers wound at this time she is accepted into facility."

107.    Once inside the facility, Ashley's "dressing falls off upper left leg" and she was "taken to intake medical desk." Her wound was evaluated by Deanna Jones, a "nurse," who noted the wound was "clean and dry," further noting "multiple puncture wounds found – large edema over site with discoloration throughout." The file also acknowledges the UTMC ER paperwork. It is electronically signed by "Deanna Jones LPN Med Supervisor," at 4:39:24 a.m.

108.    There is also note in the jail medical file indicating that Ashley's  wound was re-dressed with a "large abd pad" and "wrapped with ace wrap." A form, entitled "Arrestee Requiring Medical Treatment Prior to Admittance Form," indicates "Dressing in Intake Medical – wound clean and dry." A space for "Current Medication" is left blank, as is a space for "Last oral intake." The form was completed and signed by Deanna Jones, with "Nurse" circled.

109.     Ashley was then provided intake screenings by Corrections Officer Hannah Moats. Of note on the screening forms was the responses for "seizures," "open wound," "Bruising/Trauma Markings," and Currently taking prescribed medication?" On each of these, Moats had typed "Yes." The screening form was signed by CO Moats at 6:57:22 a.m.

**L.      Ashley Never Received a Second Dose of Antibiotic at the Jail and Was Not Provided Her Printed UTMC Prescription for Augmentin.**

110.     Thus, Nurse Jones, Medical Supervisor, CO Moats, and likely one or more others, identified only as John and Jane Does 10-15, had sufficient information to put them on notice that Ashley's medical condition was serious and required attention, including filling the Augmentin prescription or otherwise providing the dosage of Augmentin recommended and timely dispensing it to Ashley before she was released from the Detention Facility.

111.     Yet, the jail medical file indicates that no one timely or otherwise dispensed a second dose of Augmentin to Ashley, as directed by the UTMC ER doctor.

112.     Worse than even this, when Ashley was ultimately released from the Detention Facility, at about 4:00 p.m. on March 14, 2024, she was not even provided the printed prescription for Augmentin that had been given by the UTMC ER doctor.

113.     This created yet a third delay in Ashley's medical treatment. First, there was a lengthy delay from the dog-bite itself to her admission to the UTMC ER. Second, there was the delay from her first dose of Augmentin at UTMC ER, which lasted at least until her release from Jail. Third, there was yet another delay in obtaining Augmentin after no one at the Jail provided her with the Augmentin prescription that was printed for her at UTMC and handed it to one of the officers who had accompanied Ashley there, who, upon information and belief, in turn, gave it to either CO Moats or Nurse Jones.

-26-

**M. Ashley's Wound Quickly Becomes Infected After Her Release From Jail**

114. On March 20, 2024, at about 5:19 p.m., Ashley went to the Tennova-Turkey Creek Medical Center, complaining about her dog-bite injury. She was given meloxicam and the area was cleaned well. Ashley had gone to her primary care doctor's office earlier in the day and they told her to come to the ER to get looked at. They were able to drain some fluid out of her leg. Ashley reported that the area around the bite was numb.

115. She was diagnosed with an abscess and was admitted for surgery by Chimalum Okafor, M.D.

116. Ashley had worsening left hip pain and swelling and concerns of infection getting worse. There was large left thigh swelling with concerns of subcutaneous abscess formation. Imaging studies confirmed a left thigh abscess needing surgical intervention.

117. A CT of Ashley's left thigh showed "prominent inflammatory changes involving the anterior lateral aspect of the left thigh with the developing suspected fluid collection measuring 8.9 x 4.3 x 14.6 a.m."

118. On March 21, 2024, Ashley underwent repeat debridement with application of wound VAC and the wound was noted to be healthy appearing. The surgeon did remove some surrounding nonviable skin edges.

119. Ashley had an extensive area induration, cellulitis, and underlying abscess. They continued broad-spectrum antibiotics, vancomycin, Zosyn.

120. Ashley returned to the operating room on 3/25/2024 for repeat debridement as well as wound VAC placement.

121. The dressing was removed on her right thigh, and there was a large area of induration, with areas of necrosis, eschar formation noted on the left lateral thigh.

-27-

122. Ashley was receiving around-the-clock antibiotics which served as her preoperative antibiotic prophylaxis and did have SCDs placed to her bilateral lower extremities.

123. On March 25, 2024, she had an operation for excisional debridement of her left thigh nonhealing wound measuring 15 cm x 10 cm x 2 cm  2

### N.     Ashley's Injuries as a Result of the Defendants' Actions

124. As a result of the Defendants' actions, Ashley underwent multiple surgeries, debridements,  skin grafts, and medical procedures to repair the wound. Her total medical charges related to the dog bite wound is currently $457,274.03.

125. Ashley suffered excruciating pain from the assaults by Dep. Bothof and Sgt. Edgar, and mostly from the unnecessary and vicious dog attack. Defendants' conduct led Ashley to suffer severe and continuing harm, including, but not limited to, medical expenses, physical pain and suffering, temporary and permanent physical and emotional impairments, mental anguish and emotional distress, fear, humiliation, and loss of enjoyment of life.

126. Plaintiff suffered severe physical injuries, including lacerations, puncture wounds, permanent scarring, persistent muscle damage, and other impairments to her left thigh.

127. Because of the attack, Plaintiff also suffered severe emotional distress that has had a lasting psychological impact.

128. Plaintiff continues to suffer severe emotional consequences. A year later, she is still tormented by nightmares about Dep. Bothof and the attack dog. She experiences heightened levels of anxiety, depression, and post-traumatic stress.

129. Plaintiff now lives in fear of the police, knowing that at any moment, she could encounter another officer like Bothof, and that, if she does, there is nothing she can do to save herself from being held at gunpoint, brutalized, and perhaps even killed.

**O.     Use of K-9 Units to Apprehend Suspects**

130.    Police dogs are used for a variety of functions including search and rescue, drug sniffing, bomb detection, crowd control, and general patrol functions, such as suspect apprehension. Samuel G. Chapman, *History of Police Dogs in North America* 8-9 (rev. ed. 1990).

131.    A typical police dog has a biting force of 800 to 1200 pounds per square inch — comparable to a car running over a body part. Belgian Malinois,  favorites of police departments, are trained to use bites strong enough to crush bones and pierce sheet metal. https://www.washingtonpost.com/nation/2020/11/29/these-brutal-police-dog-attacks-were-captured-video-now-some-cities-are-curtailing-k-9-use/.[64]

132.    Unlike a Taser, which can be turned on and off, dogs generally cannot be controlled, even by their handlers. When an officer sets a dog on a person who immediately surrenders, the dog bite usually continues – sometimes for several more minutes – until the dog can be pulled off. In contrast, an officer using a baton must stop the beating as soon as the person surrenders. But this hasn't stopped law enforcement – including Knox County – from using dogs as potentially dangerous weapons. Here, Dep. Bothof's K-9, Dolly, appears to have been trained to "bite and hold," a policy under which police dogs were trained and tested to bite solidly, bite hard, and hold on, and trained to rebite and to bite whatever part of the body was nearest to them. Horrific injuries are thus commonplace when dogs are used as weapons.

133.    In its 2020 publication, "Guidance on Policies and Practices for Patrol Canines," the Police Executive Research Forum included this note about the proper level of response:

---

[64]See also https://www.iup.edu/criminology/files/research/reports_law_enforcements/k9-crc-report-11-08-final-for-pds_1_.pdf; https://digitalcommons.law.ggu.edu/cgi/viewcontent.cgi?article=1874&context=ggulrev.

Any police use of force, including the deployment of canines, must meet the test of proportionality. Proportionality considers whether a particular use of force is proportional to the threat faced by the officers and is appropriate given the circumstances. Proportionality requires officers to consider if they are using only the level of force necessary to mitigate the threat, and whether there is another, less injurious option available that will safely and effectively achieve the same objective.

134.    Canine force during an apprehension is typically exerted through a bite to the suspect. There are two primary methods of canine training used for suspect apprehension: "find and bite" (also sometimes called "bite and hold") and "bark and hold." Charlie Mesloh, *Barks or Bites? The Impact of Training on Police Canine Force Outcomes*, 7 Police Prac. & Res. 323, 324–25 (2006). The "bark and hold" method trains dogs to locate the subject and bark to hold the suspect in place. *Id*. at 325. The dog will only bite if the suspect makes a move to attack or flee. *Id*. This method, while it arguably has drawbacks, *id*., tends to incur fewer excessive force claims. H. Range Hutson et al., *Law Enforcement K-9 Dog Bites: Injuries, Complications, and Trends*, 29 Injury Prevention 637, 639 (1996) (detailing severe injuries experienced by police dog bite victims).

135.    Under the more popular "find and bite" method, "a dog seeks to subdue a suspect by biting his arm or leg" and "is trained to maintain his hold on the suspect until ordered to release the suspect by its handler." *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1550 (11th Cir. 1989). If the suspect attempts to free himself and the dog loses his hold on the suspect, the dog is trained to reestablish it, making the method very aggressive in nature. *Id*.

136.    As a result, "suspects often suffer serious injury from multiple bites received during the course of apprehension." *Id*. Under the "find and bite" method, the degree of control the handler maintains over the actions of his dog is a key factor in the severity of injuries incurred by a suspect. *Id*.

-30-

137.     Often, however, the dog is released and sent to chase the fleeing suspect and is not within the immediate vicinity of its handler. *Id*. at 1550–51 (noting the importance of the dog being trained to heed oral commands). Many cases have arisen where the dog, like Dolly in this case, is so worked up that the K-9 officer, here Dep. Bothof, has been unable to secure the release of the dog's bite on the suspect. *See Jones v. Fransen*, 857 F.3d 843, 847 (11th Cir. 2017).

138.     Deaths may be rare, but serious bodily harm is not. *See, e.g., Jones v. Fransen*, 857 F.3d 843, 848 (11th Cir. 2017); *Cooper v. Brown*, 844 F.3d 517, 521 (5th Cir. 2016); *Priester v. City of Riviera Beach*, 208 F.3d 919, 924 (11th Cir. 2000). While the statistics regarding police dog bites are scarce, a simple scan of case law provides an understanding of the severity of injuries inflicted by police dogs.

139.     Compared to domestic dog bites, bites from police dogs resulted in higher rates of hospitalization and surgery, and more frequent vascular injuries, bone fractures, and tendon injuries. Peter C. Meade, *Police and Domestic Dog Bite Injuries: What are the Differences? What are the Implications About Police Dog Use?*, 37 Injury Extra 395, 399 (2006) (noting seriousness of police dog bite injuries). As many as 20% of people bitten by police dogs experienced severe complications, including permanent disfigurement. *See* Hutson, et al., supra. While deaths are rare, the injuries are not "band-aid" injuries, as often suggested. *Meade*, supra, at 400.

140.     Police expect and demand suspects to act rationally – to peacefully comply and to refrain from fighting back when faced with a police dog. In many cases, it may be literally impossible for the suspect to accomplish this, because the body is no longer in the control of the rational mind. The use of a police dog can make it more difficult for a person to comply. *See* Martin Kaste, *Videos Reveal a Close, Gory View of Police Dog Bites*, NPR: *All Things Considered* (Nov. 20, 2017, 5:01 AM), https://www.npr.org/2017/11/20/563973584/videos-reveal-a-close-goryview-of

-31-

-police-dog-bites. People who have experienced being bitten by a police dog have claimed that once the dog bit, they cannot concentrate or follow the commands of the officers. Id. "You just look at the dog as the source of pain and you do everything you can to address that pain. Those shouted commands – you'll deal with that later, when the pain stops." *Id.*

## V. WAIVER OF IMMUNITY

141. The County has waived immunity for its own negligence and for its employees, misconduct of officers acting under color of law, and for the negligence of deputies, as set out in Tenn. Code Ann. § 29-20-305. There is no immunity for individuals for criminal conduct, or conduct which is willful or malicious.

## VI. CLAIMS FOR RELIEF

### COUNT ONE

### EXCESSIVE FORCE

**42 U.S.C. §§ 1983 and 1988, Under Fourth and/or Fourteenth Amendments**

**(Against Dep. Bothof and Sgt. Edgar, Individually)**

142. The allegations of the preceding paragraphs of this Complaint, including Paragraph Nos. 1-15 and 36-140, are hereby incorporated by reference, as if set forth verbatim.

143. Plaintiff had a clearly established constitutional right under the Fourth and Fourteenth Amendments to be free from excessive force during an arrest or investigatory stop.

144. Excessive force under the Fourth and Fourteenth Amendments is objectively unreasonable conduct that, given the facts and circumstances, would "shock the conscience" and amount to an arbitrary exercise of governmental power. The force used by law enforcement against a suspect should be equal to or just one level greater than the force demonstrated by the suspect. An unarmed person suspected of stealing should not face dismemberment.

-32-

145. The reasonableness analysis should not immunize "hot-headed, ill-trained, belligerent, or incompetent officers." Brandon Garrett & Seth Stoughton, *A Tactical Fourth Amendment*, 103 Va. L. Rev. 211, 215-16 (2017). In the Sixth Circuit, "the law is clearly established that an officer may not use additional gratuitous force once a suspect has been neutralized." *Alkhateeb v. Charter Township of Waterford*, 190 F. App'x 443, 452 (6th Cir. 2006).

146. A review of the first six and a half minutes of Dep. Bothof's body camera recording alone demonstrates that Ashley:

- was unarmed;

- had been stopped as she was exiting a Weigels for a complaint that she had stolen some yard decorations;

- was lying on her stomach on the pavement – with one arm being gripped by Bothof behind her back and the other outstretched on the pavement – when Bothof commanded his dog to attack her;

- had never attempted to flee; and

- posed no safety risk at any time, much less when the dog was released.

147. There has to be a reasonable belief on the part of the officer that the individual is presenting a threat to his or her safety or the safety of others. Here, it's clear that no such threat to Dep. Bothof's or Edgar's safety ever existed. Plaintiff simply tried to protect herself by covering up and withdrawing from an overly aggressive officer as he manhandled her. There is nothing in the video to suggest she tried to assault Bothof.

148. Here, the force used by both Dep. Bothof and Sgt. Edgar on the Plaintiff was unlawful, carrying with it a high risk of causing serious bodily harm to Plaintiff, and was both

-33-

unnecessary and unreasonable under the circumstances that existed. In no situation should an unarmed person suspected of stealing yard decorations – and making no threats or attempts to flee – ever face dismemberment or disfigurement, as Plaintiff did.

149.    From Dep. Bothof unholstering his gun and aiming it toward Plaintiff after she had simply reached at her car door handle and briefly cracked the door open, to going "hands-on" with Plaintiff, slamming her against the side of her SUV, to taking the Plaintiff down hard to the ground, delivering a knee-strike to her chest, to generally manhandling the Plaintiff by twisting her arms behind her and dragging her on the pavement, and finally, to deploying his K-9 against the Plaintiff as she was face-down on the pavement, then watching as the K-9 shredded the tissue in Plaintiff's thigh, even as Plaintiff was under control or subdued – all of the force used by Bothof was unreasonable under the circumstances and no reasonable officer would have employed such force.

150.    Plaintiff was a suspect in a minor offense, *i.e.*, petty theft of property. She was not described by dispatch as violent, armed, or otherwise dangerous. In essence, she was accused of being a "porch pirate." She was not a threat to Dep. Bothof or anyone else and did nothing to exhibit threatening behavior toward him. She was unarmed. She made no threats, verbal or physical. She made no effort to flee or run from Bothof or Sgt. Edgar. Even when she opened her car door and Bothof told her to shut it, she did.

151.    By holding Ashley at gunpoint, slamming her against her SUV, violently taking her to the ground, using a knee-strike to her chest, manhandling her for several minutes as he yanked and jerked and pulled on her arms, and unleashing his highly agitated attack dog on her as she lay prone on the ground, Dep. Bothof violated Plaintiff's Fourth Amendment right to be free from excessive force, as incorporated to the states through the Fourteenth Amendment.

-34-

152.     Sgt. Edgar also violated Plaintiff's Fourth Amendment rights by kneeing Plaintiff in the back while she was being attacked by the K-9 and gripped by Bothof and by not intervening in the unlawful force being used by Bothof.

153.     No reasonable officer could conclude that Dep. Bothof's and Sgt. Edgar's level of force was necessary, as Plaintiff was at most passively resisting.

154.     Moreover, Dep. Bothof and Sgt. Edgar violated Plaintiff's Fourth Amendment right to be free from excessive force by permitting Dolly to continue biting Plaintiff while she remained on the ground and neglecting to remove the dog and stop it from mauling her for approximately 81 seconds.

155.     Even if Dep. Bothof's initial deployment of his K-9 partner had been reasonable (it was not), a K-9's deployment to apprehend a suspect may become unreasonable if allowed to go on longer than necessary. Here, Dep. Bothof and also Sgt. Edgar allowed the K-9 partner – Dolly – to keep mauling Plaintiff for eighty-one seconds, fully forty-four (44) seconds after Bothof initially commanded Dolly to "leave it." Seven seconds after Dep. Bothof commanded Dolly to "leave it," he directed Sgt Edgar to put Plaintiff in handcuffs before he would withdraw Dolly. Meanwhile, for fifty-one seconds, Sgt. Edgar shouts to Bothof, "get the dog off, get the dog off of her," "let go of that leg, let go of that leg,"'get dolly off of her," and "take her off, Dolly is still biting."

156.     By all accounts – the body-cam video, Sgt. Edgar, and Plaintiff – Dep. Bothof and Edgar either refused or was simply unable to disengage or control Dolly as she continued to maul Plaintiff's leg.

157.     The case is controlled by *Rainey v. Patton*, 534 F. App'x 391, 397 (6th Cir. 2013), where the Court concluded that it was unlawful for an officer to employ a police dog against an unarmed suspect who had been stopped due to a traffic offense. Even though the plaintiff had not

yet been handcuffed, she was on the ground and not attempting to flee when the dog was released. *Id*. Here, all of the force used by Dep. Bothof and Sgt. Edgar on Plaintiff occurred after she was under the physical control of Bothof, and then, Edgar and Bothof.

158.    Dep. Bothof justified much, if not all, of his aggressive actions toward Plaintiff by describing her own actions active resistance. But Plaintiff was at most offering only passively resistance to Bothof, and his aggressive, increasingly violent actions were completely disproportional force-wise to her actions, as she posed no immediate safety risk to him or others.[65]

159.    Here, Plaintiff passively – not actively – resisted. No one contends that Plaintiff verbally threatened Dep. Bothof. Merely refusing to comply with an officer's command and verbally indicating as much is not active resistance. Passive resistance cannot justify Dep. Bothof's uses of force,  including a takedown.

160.    At the outset of the incident, much of the problem concerned Dep. Bothof's aggressive and impatient demeanor. This was exemplified by Bothof's near-immediate decision to draw his weapon on the Plaintiff as she cracked open the door to her SUV. Instead of simply instructing her to close the door (which she did after being commanded to do so), Bothof inexplicably chose to draw his weapon and aim it Plaintiff, immediately escalating what should have been a routine stop into a violent one.[66]

---

[65]Under Sixth Circuit law, "active resistance" consists of "some outward manifestation" of "volitional and conscious defiance" and includes the "physical[]" acts of "struggling with, threatening, [and] disobeying officers." It also includes some acts of verbal hostility.

[66]Bothof testified that the moment when he pulled his gun on Ashley and yelled at her was "an attempt to de-escalate." Yet, KCSO's use of force policy defines "de-escalation" as a "decrease in the severity of force as a response to a decrease in the level of resistance."

-36-

161.     But that's not all. Instead of de-escalating the situation by calmly talking to Ashley, Bothof next decided to "go hands on" and slam the already terrified young woman face first into her the side of her SUV and began manhandling her, threatening her, and otherwise terrorizing her. Bothof was hardly done, as he next decided to take Ashley to the ground and violently slammed her onto the pavement, where he delivered a knee strike to Ashley's chest. Dep. Bothof's takedown contravened clearly established law. The Sixth Circuit has determined that the use of a takedown maneuver, in a variety of scenarios, can amount to excessive force, including, for example, when a detainee has merely insulted an officer, refused to comply with orders, and continually raised his hand. A takedown on a detainee who is not actively resisting is objectively unreasonable.

162.     Finally, just when the Plaintiff may have thought the worst had happened, Dep. Bothof summoned Dolly, his K-9 partner, a powerful Belgian Malinois, that had never been released by popping the door.  Dolly arrived excited and was directed by her handler to the Plaintiff, who lay helpless on the pavement.

163.     Less than thirty seconds after Dep. Bothof's K-9 partner first bit down on Plaintiff's thigh, Sgt. Edgar, Bothof's supervisor, appears, puts his knee in Plaintiff's back, and grabs hold of her wrists to handcuff her. Edgar immediately tells Bothof to get the dog off. Bothof – with Plaintiff's now under Edgar's knee with her hands restrained – tells Edgar to handcuff Plaintiff's before he commands the dog to release. Edgar cuffs her, but continues to keep his knee on Plaintiff's back for another ten seconds. It takes another fifty (50) seconds for Bothof to get Dolly off Plaintiff.

164.     Here, no reasonable officer would release a K-9 partner like Dolly on an unarmed 5'2" female suspect who is face-down on the pavement with at least one arm under officer control. Moreover, after Sgt. Edgar arrived, with the 240-pound Bothof holding onto the Plaintiff, Edgar further subdued the Plaintiff by placing his knee on her back. Still, Dolly continued to maul the

-37-

Plaintiff's thigh for another fifty-one seconds before releasing. Even after Edgar had handcuffed the Plaintiff, Dolly continued to tear into the Plaintiff's thigh for another ten seconds.

165.    It is clearly established that excessive duration of a K-9 bite could constitute excessive force, and thus, suggesting that the intensity and duration of the bite could, by themselves, render such officers' actions unconstitutional. A reasonable officer would have known that the continued seizure by a police canine after the Plaintiff was subdued for an additional fifty-one seconds was unlawful.

166.    Besides, no particularized case law is necessary for an officer to know that excessive force has been used when an officer sics a canine on an unarmed, non-dangerous, subdued or handcuffed 5'2" female suspect who is under control, as was the Plaintiff, especially while she was face-down on the pavement or being kneed in the back by a male officer.

167.    Even if some force were constitutionally reasonable, the degree of force used by Dep. Bothof and by Sgt. Edgar here was clearly excessive and unconstitutionally disproportionate in degree to the circumstances.

168.    The violations of Plaintiff's Fourth Amendment rights by Dep. Bothof and Sgt. Edgar directly and proximately caused Plaintiff to suffer (a) bodily injuries; (b) excruciating physical pain and suffering; (c) substantial economic damages; and (d) severe emotional suffering and mental anguish.

169.    Furthermore, Dep. Bothof's conduct was also willful, wanton, malicious, and done with reckless disregard for Plaintiff's federally-protected rights, justifying a substantial award of punitive damages against him so as to prevent a recurrence of such misconduct and to deter others from engaging in similar misconduct.

-38-

170.     Plaintiff sues Dep. Bothof and Sgt. Edgar for violating her constitutional rights, and seeks any and all damages allowable, attorney's fees pursuant to 42 U.S.C. § 1988, costs, and discretionary costs.

## COUNT TWO

### FAILURE TO PROTECT

### 42 U.S.C. §§ 1983 and 1988, Under Fourteenth Amendment

### (Against Dep. Bothof and Sgt. Edgar, Individually)

171.     The allegations of the preceding paragraphs of this Complaint, including Paragraph Nos. 1-15 and 36-140, are hereby incorporated by reference, as if set forth verbatim.

172.     Despite being physically present, aware of Dep. Bothof's constitutional violations, and having ample opportunity to intervene and stop them, Sgt. Edgar violated Plaintiff's right to be free from unconstitutionally excessive force.

173.     Sgt. Edgar arrived on the scene of the incident after Dep. Bothof had deployed his K-9 and Dolly was mauling the Plaintiff's thigh. At the time, the Plaintiff was face-down on the pavement, Bothof had hold of one of arms, and she was neither a threat to the officers' safety nor a threat to flee or run. Yet, Dolly was mangling her leg, as Edgar kneeled a couple of feet away.

174.     Sgt. Edgar owed Plaintiff a duty of protection against the use of excessive force, as he had observed or had reason to know that Dep. Bothof was using excessive force against the Plaintiff and being present on the scene and in direct contact with the Plaintiff and Dep. Bothof, not to mention being Bothof's supervisor, Edgar had both the opportunity and the means to prevent the harm from occurring any further than it had when he arrived.

175.     Despite Plaintiff not being a threat, Sgt. Edgar continued to overlook what was happening, took direction from Dep. Bothof to continue handcuffing the Plaintiff before Bothof

-39-

would agree to release Dolly, and even after handcuffing Plaintiff, watched as Dolly continued to maul the Plaintiff for at least ten additional seconds.

176.    Sgt. Edgar this made an intentional decision to permit Plaintiff to continue to be victimized by the K-9 and victimized her still further by planting his own knee and weight onto Plaintiff's back as Dolly chewed on her thigh. Edgar put the Plaintiff at substantial risk of suffering serious harm by not intervening in the unreasonable force being deployed by Bothof against the Plaintiff. A reasonable officer in the circumstances would have appreciated the high degree of risk involved, and thus, the consequences of Edgar's conduct is obvious. Finally, by not taking such measures, Edgar caused the Plaintiff's injuries.

177.    By failing to protect Plaintiff from Dep. Bothof's unconstitutionally excessive use of force, despite being physically present, aware of Bothof's constitutional violations, and having ample opportunity to intervene, Sgt. Edgar violated failed to protect the Plaintiff's right to be free from unconstitutionally excessive force.

178.    For these same reasons, Dep. Bothof also unlawfully failed to protect the Plaintiff from Dolly, especially after Sgt. Edgar arrived and completely subdued the Plaintiff.[67]

179.    The violations of Plaintiff's Fourth and Fourteenth Amendment rights by Dep. Bothof and Sgt. Edgar directly and proximately caused Plaintiff to suffer (a) bodily injuries; (b) excruciating physical pain and suffering; (c) substantial economic damages; and (d) severe emotional suffering and mental anguish.

180.    Furthermore, Dep. Bothof's conduct was also willful, wanton, malicious, and done with reckless disregard for Plaintiff's federally-protected rights, justifying a substantial award of

---

[67]Not that Plaintiff needed to be subdued, as she was face-down on the pavement, with two male officers and an attack dog all assaulting her.

punitive damages against him so as to prevent a recurrence of such misconduct and to deter others from engaging in similar misconduct.

181.     Plaintiff sues Dep. Bothof and Sgt. Edgar for violating her constitutional rights, and seeks any and all damages allowable, attorney's fees pursuant to 42 U.S.C. § 1988, costs, and discretionary costs.

## COUNT THREE

## DENIAL OF MEDICAL CARE

### 42 U.S.C. §§ 1983 and 1988, Under Fourteenth Amendment

### (Against Dep. Bothof, Sgt. Edgar, Dep. Merritt, Dep. Millsap, Dep. Bryant, and John and Jane Does 1-10, Individually)

182.     The allegations of the preceding paragraphs of this Complaint, including Paragraph Nos. 1-15 and 36-140, are hereby incorporated by reference, as if set forth verbatim.

183.     Dep. Bothof, Sgt. Edgar, Dep. Merritt, Dep. Millsap, Dep. Bryant, and John and Jane Does 1-10 were each acting under color of state law.

184.     Under 42 U.S.C. § 1983, a person has a federal cause of action for money damages against an individual acting under color of state law who deprives another of rights, privileges, or immunities secured by the United States Constitution and federal laws. Here, each of the Individual Defendants were acting under color of state law.

185.     The Fourteenth Amendment to the United States Constitution requires that pretrial detainees be provided adequate medical care while in the custody of any governmental entity.

186.     An individual officer engages in conduct in violation of the Due Process Clause of the Fourteenth Amendment where he or she demonstrates deliberate indifference to the serious needs of a pre-trial detainee, such as Plaintiff, by intentionally denying or delaying adequate medical care

-41-

for said person. Here, a reasonable layperson would have concluded that Plaintiff – who had been mauled by Dep. Bothof's K-9 attack dog and whose thigh tissue had been torn from her leg and splattered on the pavement –  needed medical treatment. Plaintiff sat crying and occasionally screaming in pain on the pavement for over an hour with multiple dog-bite lacerations on her thigh, while the above-named Defendants milled about the parking lot, joking, laughing, occasionally talking to the Plaintiff, but never once offering to render or rendering her any aid.

187.    The body-cam video appears to confirm that as Plaintiff sat on the parking lot and these officers wandered about, none of the above-named Defendants contacted dispatch to request an ambulance or otherwise requested medical attention for Plaintiff until nearly 1:30 a.m., well over an hour after the dog-bite had occurred.

188.     It was only after Deps. Bothof and Millsap began discussing what they believed to be a pile of dog vomit on the parking lot that they realized it was, in fact, fatty tissue from the Plaintiff's thigh.

189.    It was only then that Dep. Bothof expressed some urgency about an ambulance and indicated to dispatch that Plaintiff may have a major laceration.

190.    Even then, none of the above-named officers – all of whom were standing around the Plaintiff talking – bothered to check on her, attempt to clean the wound for her, or even tried to get instructions from EMS or other medical services concerning what they could do to help.

191.    Each of the officers knew that the Plaintiff had suffered a bad dog-bite and therefore had an obvious and serious medical injury. Yet, these Defendants failed to provide Plaintiff with any aid or medical care. A layperson would have noticed that she was seriously injured. It did not take someone with a medical background to recognize that someone who had been bitten by an attack dog so savagely was in need of serious medical attention.

-42-

192.    By not seeing to Plaintiff's serious medical needs, these Defendants allowed her condition to worsen and her excruciating pain to continue.

193.    By not having Plaintiff immediately transported to a hospital where her injuries could have been properly treated, the above-named Defendants violated her rights under the Fourteenth Amendment.

194.    The violations of Plaintiff's Fourteenth Amendment rights by the above-named Defendants directly and proximately caused Plaintiff to suffer (a) bodily injuries; (b) excruciating physical pain and suffering; (c) substantial economic damages; and (d) severe emotional suffering and mental anguish.

195.    Plaintiff sues the above-named Defendants for violating her constitutional rights, and seeks any and all damages allowable, attorney's fees pursuant to 42 U.S.C. § 1988, costs, and discretionary costs.

## COUNT FOUR

## DENIAL OF MEDICAL CARE

### 42 U.S.C. §§ 1983 and 1988, Under Fourteenth Amendment

### (Against CO Moats, LPN Med Supervisor Deanna Jones, and John and Jane Does 11-15, Individually)

196.    The allegations of the preceding paragraphs of this Complaint, including Paragraph Nos. 1-15 and 36-140, are hereby incorporated by reference, as if set forth verbatim.

197.    CO Moats, LPN Jones, and John and Jane Does 11-15 were each acting under color of state law.

198.    Under 42 U.S.C. § 1983, a person has a federal cause of action for money damages against an individual acting under color of state law who deprives another of rights, privileges, or

-43-

immunities secured by the United States Constitution and federal laws. Here, each of the Individual Defendants were acting under color of state law.

199.    The Fourteenth Amendment to the United States Constitution requires that pretrial detainees be provided adequate medical care while in the custody of any governmental entity.

200.    Plaintiff alleges that CO Moats, Nurse Jones, and John and Jane Doe Defendants 11-15 violated her rights guaranteed by the Fourteenth Amendments of the United States Constitution by their deliberate indifference to her obvious and serious medical needs.

201.    Plaintiff alleges that she had a sufficiently serious medical need when she was triage, screened, and evaluated at the Roger D. Wilson Detention Facility, as she had been mauled by Dep. Bothof's K-9 partner, Dolly, and had suffered multiple lacerations to her left upper leg. This injury had prompted KCSO deputies to transport Plaintiff to UTMC ER, where she was treated, her lacerations cleaned and dressed, and most importantly, she was given antibiotics and prescribed Augmentin (an antibiotic) on a printed form to cover a period of five days, including a dose prior to being released from Jail.

202.    Plaintiff was accompanied to UTMC by two KCSO deputies, presumably Desiree Merritt and Thomas Millsap. The deputies were provided Plaintiff's discharge papers, including the printed prescription and infection prevention instructions, and, in turn, provided those papers to Nurse Jones and/or CO Moats at the Detention Facility.

203.    Plaintiff came into the Detention Facility with a particularly bad K-9 bite. The information provided to the officers and then to CO Moats and Nurse Jones explicitly indicated the severity of an infection, noting that it could require surgical intervention.  She was also in extreme pain due to the number, size, and depths of the wounds (pain can be a sufficiently serious medical need for purposes of an indifference claim).

-44-

204. Medical journals and texts indicate that the most common complication of any animal bite is infection. Antibiotics are generally recommended to prevent infection in people with high-risk wounds, such as deep puncture wounds (which was certainly the case here), wounds involving a bone or joint, and for people with other health problems, such as a weakened immune system or diabetes, which could increase the risk of serious infection.

205. Critically, infectious disease texts generally indicate that infections from dog bites can develop rapidly, ***sometimes within 12 to 24 hours***, causing redness, swelling, and intense pain.

206. There is no indication in Plaintiff's jail medical file that a physician of any sort examined her, in person, via telephone or remotely, or that any physician provided a recommendation or opinion with respect to the Plaintiff's wound or offered an alternative treatment than antibiotics to prevent an infection.

207. Despite the information available to them, Plaintiff never received a second dose of Augmentin. Nor did she receive her printed prescription from UTMC that had been given to the officers who had accompanied Plaintiff and then passed on to CO Moats and LPN Jones.

208. It is important to not delay medical treatment and antibiotics. Yet, there were, in fact, at least three delays by Knox County employees. First, an approximate two and a half hour delay from the moment Ashley was mauled by Dep. Bothof's K-9 partner until she was treated at UTMC and given her first dose of Augmentin. Second, the approximately fourteen-hour period from the moment she was provided the first dose of Augmentin until she was released from the Detention Facility at about 4:00 p.m. on March 14, 2024. And third, the period of time after she left the Detention Facility *without her Augmentin prescription* until she was able to secure a comparable antibiotic.

-45-

209.    Needless to say, by the time the first dose of Augmentin had run its course, without a strong antibiotic, bacteria began to grow again and the infection quickly set in.

210.    When Plaintiff left the Jail, she did not have her Augmentin prescription. Meanwhile, the bacteria in Plaintiff's horrible wound continued to grow, such that she quickly developed an infection that required multiple surgical interventions.

211.    There can be no serious doubt that Plaintiff had a serious medical need for keeping current on her antibiotics to prohibit an infection.

212.    Plaintiff further alleges that Nurse Jones, CO Moats, and John and Jane Doe Defendants acted deliberately, and recklessly in the face of an unjustifiably high risk of harm to Plaintiff that was either known to them – or at least so obvious that it should be known.

213.    Whatever medical care Plaintiff may have received at the Detention Facility, *e.g.*, perhaps a pad and Ace bandage, was so woefully inadequate as to amount to no treatment at all.

214.    As a direct and proximate result of the denial of medical care by Nurse Jones, CO Moats, and John and Jane Doe Defendants 10-15, having been provided specific information and instructions from the UTMC ER doctor's discharge papers, both Nurse Jones and CO Moats realized the substantial risk to Plaintiff's medical health of as a result of the serious dog-bite but disregarded that risk, thereby creating a risk of serious harm to the Plaintiff. As a direct result, Plaintiff has, sustained personal injury, severe physical pain and suffering, mental anguish, loss of dignity, loss of enjoyment of life, and other damages.

215.    The violations of Plaintiff's Fourteenth Amendment rights by the above-named Defendants directly and proximately caused Plaintiff to suffer (a) bodily injuries; (b) excruciating physical pain and suffering; (c) substantial economic damages; and (d) severe emotional suffering and mental anguish.

216.     Plaintiff sues the above-named Defendants for violating her constitutional rights, and seeks any and all damages allowable, attorney's fees pursuant to 42 U.S.C. § 1988, costs, and discretionary costs.

### COUNT FIVE

**FAILURE TO TRAIN AND SUPERVISE AS TO USE-OF-FORCE
POLICY OR CUSTOM CONCERNING DEPLOYMENT OF K-9 OFFICERS**

**42 U.S.C. §§ 1983 and 1988
Under Fourth and/or Fourteenth Amendments**

**(Against Knox County)**

217.     The allegations of the preceding paragraphs of this Complaint, including Paragraph Nos. 1-15 and 36-140, are hereby incorporated by reference, as if set forth verbatim.

218.     Sheriff Spangler has final authority and makes policy for the KCSO in establishing and implementing policies and/or procedures with respect to the use of force by deputies against inmates and the legal limits of such activities for deputies employed by the KCSO.

219.     Knox County's policy or custom also appears to allow K-9 officers to deploy their dog partners handlers were given leave to release dogs to bite suspects, including female suspects, they had no reason to believe were armed or dangerous.

220.     Under national standards, law enforcement departments that utilize K-9s should provide officers comprehensive training relative to the particular circumstances in which they may deploy their K-9s against suspects and when they should recall their K-9s from an attack. Knox County Sheriff Tom Spangler's failure to develop and promulgate lawful policies outlining the guidelines for K-9 situations and the appropriate use of K-9 partners and to properly train K-9

officers to adhere to such guidelines constitute reckless or deliberate indifference to the constitutional rights of pretrial detainees who have already surrendered, are already under control, or have already been subdued.

221. Here, the dangerous and unconstitutional consequences of failing to properly train Dep. Bothof in the reasonable use of his K-9 partner are so patently obvious that Knox County violated Ashley's Fourth and/or Fourteenth Amendment rights. This lack of training appears to have necessarily deprived Dep. Bothof of the tools he needed to safely handle the situation that confronted him. Consequently, Dep. Bothof wound up escalating what would otherwise have been a routine misdemeanor theft offense and needlessly causing a citizen to suffer serious, permanent, and disabling injuries.

222. Upon information and belief, Dep. Bothof's supervisors and ultimately, Sheriff Spangler, also ratified his unreasonable use-of-force by taking no disciplinary action against him and signing off on his actions as conforming to Knox County's force policy. Sheriff Spangler thus knowingly acquiesced in the unconstitutional conduct of Dep. Bothof through the execution of his job functions, and in doing so, rendered Knox County liable. This failure to recognize Dep. Bothof's unconstitutional actions implies that future Fourth Amendment violations by County deputies will also be condoned.

223. Here, the unconstitutional consequences of failing to train officers in the reasonable and justifiable use of force – the use of K-9s – are so patently obvious that the County and Sheriff Spangler are liable under § 1983. The actions of Dep. Bothof_ – unnecessarily deploying his K-9 against an unarmed and non-dangerous female suspect, when she offered only passive resistance, if any – demonstrate obvious and egregious training and supervisory deficiencies, making the KCSO's use-of-force and/or K-9 training constitutionally defective.

-48-

224. Upon information and belief, as final policymaker for the KCSO, Sheriff Spangler established and implemented policies and procedures, and/or ratified pre-existing policies and procedures, regarding the use of force by KCSO deputies, including the use of K-9 to apprehend suspects, which policies and procedures themselves violate federal constitutional law.

225. And even if the formal policies and procedures of the KCSO are not themselves unlawful, alternatively, the operation of such policies and procedures reflects a standard operating procedure authorizing KCSO deputies to violate the federally-protected rights of suspects, as described herein.

226. Violations of constitutional rights of the type inflicted on the Plaintiff, specifically the use of excessive force via K-9, are the known or obvious consequences of KCSO policies, customs, and procedures that violate federal law, to which Sheriff Spangler and the County have acquiesced or have tacitly authorized. The actions and omissions of Sheriff Spangler and the County, as identified herein, reflect their deliberate indifference to such known or obvious consequences.

227. Such violations, as condoned by Sheriff Spangler and the County, were the moving force behind – and directly and proximately caused – the violations of Plaintiff's constitutional rights; and render the County liable.

228. The County, KCSO, and Sheriff Spangler had a duty of care to ensure that KCSO deputies were properly trained in the appropriate procedure for using force, including using a K-9 to apprehend suspects. This duty extends to ensuring that KCSO officers were properly trained concerning the limits of their authority to use such force.

229. The County, KCSO, and Sheriff Spangler also had a duty to properly supervise KCSO officers and ensure KCSO supervisory officers did not condone the unnecessary uses of force, including the use of K-9s. This is especially true when there is (a) a "likelihood that [a]

-49-

situation will recur" (b) with such a "high degree of predictability" that "an officer lacking specific tools to handle that situation will violate citizens' rights." Officers must have specific training to be equipped to properly react to situations, as in this case, without unnecessarily escalating them to force situations.

230.    In this case, Dep. Bothof lacked the tools that the County, KCSO, and Sheriff Spangler should have provided him to safely handle such a recurring situation. Consequently, he unnecessarily escalated the level of force, over what began as a routine investigative stop.

231.    By failing to conduct a meaningful investigation of Dep. Bothof's actions, Sheriff Spangler let it be known that he condoned the unreasonable use of the taser on suspects.

232.    By ratifying the unreasonable use-of-force, Sheriff Spangler knowingly acquiesced in the unconstitutional conduct of Dep. Bothof through the execution of his job function, rendering the County liable.

233.    As a direct and proximate result of the actions/omissions of the County, KCSO, and Sheriff Spangler causing the violation of his Fourth Amendment rights, Plaintiff suffered (a) bodily injuries; (b) excruciating physical pain and suffering; (c) economic damages; and (d) severe emotional suffering and mental anguish.

234.    Plaintiff sues the County for violating his constitutional rights, and seeks any and all damages allowable, as well as attorney's fees pursuant to 42 U.S.C. § 1988, costs, and discretionary costs.

## COUNT SIX

## FAILURE TO TRAIN AND SUPERVISE AS TO POLICY OR
## CUSTOM OF FAILING TO PROVIDE MEDICALLY NECESSARY PRESCRIPTION
## MEDICATION TO PRETRIAL DETAINEES

### 42 U.S.C. §§ 1983 and 1988 under Fourteenth Amendments

### (Against the County)

235.    The allegations of the preceding paragraphs of this Complaint, including Paragraph

Nos. 1-15 and 36-140, are hereby incorporated by reference, as if set forth verbatim.

236.    Upon information and belief, Knox County, through its own policies, customs, and/or

procedures, has failed to adequately train and supervise its employees, officers and agents (medical

personnel or otherwise) to provide detainees and inmates adequate medical care for serious medical

needs.

237.    Specifically, Knox County jail or medical staff routinely refuses or otherwise fails to

dispense medically necessary prescription medication. But for such improper policies, customs, or

procedures, it is hard to believe how: (a) Plaintiff was transported to UTMC for a dog-bite wound

received from a KCSO K-9; Plaintiff received one dose of Augmentin, a strong antibiotic proven to

treat such wounds, at UTMC; Plaintiff also received a printed prescription for five days worth of

Augmentin, to be taken every 12 hours; the printed prescription and discharge information about

preventing infection was given to a KCSO deputy who accompanied Plaintiff to UTMC and later

transported her to Jail; and the prescription and paperwork were provided to jail medical staff; and

Plaintiff not only never received a second dose of Augmentin, but also did not receive the printed

prescription back from the Jail.

238.    Plaintiff's antibiotic treatment was unnecessarily delayed, the bacteria in the wound

allowed to grow, and she wound up getting a severe infection in the following days. Plaintiff has now

incurred multiple surgeries and medical procedures, skin grafts, hospitalizations, and other care, with her related charges now exceeding $454,000.

239.    Knox County's failure to adequately train and supervise its employees, officers, and agents to provide inmates adequate medical care for serious medical needs, including antibiotics, resulted in Plaintiff's infection.

240.    Knox Count supervisors, knowing of Plaintiff's serious medical needs, had a constitutional duty to establish and implement policies, practices and procedures designed to assure that she received adequate medical care and failed to do so.

241.    Plaintiff should have been safe and protected in Knox County's custody. Instead, she was neglected, as the antibiotic-related instructions provided to the officer who accompanied Plaintiff to UTMC were received by detention facility staff, including nursing staff, but were completely ignored, allowing her significant dog-bite injury to worsen, inevitably causing her to suffer unbearable pain, inhuman indignities, multiple surgeries and procedures, substantial mental anguish, and to incur over $454,000 in medical bills. This was the natural result of Knox County's policy or custom of depriving critical and medically necessary and authorized medication to pretrial detainees, often, as here, at their great peril.

242.    As a direct and proximate result of the actions/omissions of the County, KCSO, and Sheriff Spangler causing the violation of his Fourth Amendment rights, Plaintiff suffered (a) bodily injuries; (b) excruciating physical pain and suffering; (c) economic damages; and (d) severe emotional suffering and mental anguish.

243.    Plaintiff  sues the County for violating his constitutional rights, seeks all damages allowable, and seeks attorney's fees pursuant to 42 U.S.C. § 1988, costs and discretionary costs.

-52-

## COUNT SEVEN

## BATTERY

### (Against the County, Dep. Bothof, and Sgt. Edgar, Individually)

244.     The allegations of the preceding paragraphs of this Complaint, including Paragraph

Nos. 1-15 and 36-140, are hereby incorporated by reference, as if set forth verbatim.

245.     The unreasonable force used against Plaintiff by Dep. Bothof and Sgt. Edgar, acting

under color of law, constitutes a battery.

246.     As a direct and proximate result of the unreasonable actions of Dep. Bothof and Sgt.

Edgar, Plaintiff suffered disabling bodily injuries, severe pain and suffering, and emotional distress.

247.     Defendants had no legal justification for using such unreasonable force against the

Plaintiff. As such, their use of force constituted a battery under Tennessee law.

248.     The foregoing acts proximately caused the injuries to Plaintiff, entitling her to recover

compensatory damages from the County, Dep. Bothof, and Sgt. Edgar. Said damages include, but are

not limited to, Plaintiff's disabling injuries, the tremendous pain and suffering she endured, and

severe emotional distress.

249.     The conduct of Dep. Bothof was malicious, wanton, oppressive, and accomplished

with a conscious disregard for Plaintiff's rights, entitling her to an award of punitive damages.

## COUNT EIGHT

## NEGLIGENCE

### (Against the County, Dep. Bothof, Sgt. Edgar,  Dep. Merritt, Dep. Millsap, Dep. Bryant, John and Jane Does 1-10, Individually)

250.     The allegations of the preceding paragraphs of this Complaint, including Paragraph

Nos. 1-15 and 36-140, are hereby incorporated by reference, as if set forth verbatim.

-53-

251.    Defendants had a duty to render aid to Plaintiff. Defendants owed such a duty to the Plaintiff as she was in their care and custody. As described above, Defendants breached their duties of due care and were negligent, grossly negligent, reckless, willful, and wanton in all of the foregoing particulars.

252.    The actions of the Defendants – refusing to offer any aid to Plaintiff as she sat helpless on the parking lot with a severe dog-bite wound inflicted by a KCSO K-9 – were negligent.

253.    They failed to call for EMS for over an hour as Plaintiff suffered in excruciating pain.

254.    The acts of the Defendants proximately caused Plaintiff's injuries, entitling Plaintiff to recover compensatory damages from the Defendants for such damages.

255.    Pursuant to the Tennessee Governmental Tort Liability Act, these Defendants also owed Plaintiff a duty of care to be free from excessive force, to protect him the negligent use of the K-9, and to protect him from serious injury.

256.    After Plaintiff was mauled for eighty-one (81) seconds by Dep. Bothof's K-9, she lay or sat on the parking lot of Weigels, handcuffed, with her leggings now pulled below her buttocks, as customers and officers milled about and a few stood over her, talking to her and joking around with each other. Plaintiff stayed on the pavement for over an hour, until AMR came to take her to UTMC.

257.    As a direct and proximate result of Defendants' conduct, as alleged above, Plaintiff was caused to suffer bodily injuries and severe pain and suffering.

258.    The foregoing acts of the Defendants proximately caused the injuries to Plaintiff, entitling her to recover compensatory damages from Defendants for such damages. Said damages include, but are not limited to, disabling bodily injuries, tremendous pain and suffering, and severe emotional distress.

-54-

## COUNT NINE

## INTENTIONAL OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS

### (Against the County and Dep. Bothof, Individually)

259. The allegations of the preceding paragraphs of this Complaint, including Paragraph Nos. 1-15 and 36-140, are hereby incorporated by reference, as if set forth verbatim.

260. The actions alleged above against these Defendants were outrageous and utterly intolerable in a civilized society, and were done with reckless or intentional disregard of the probability of causing severe emotional distress.

261. Dep. Bothof repeatedly, unnecessarily, and unreasonably escalated a simple stop of a young woman suspected of petty theft into a situation involving a serious and dangerous risk to Plaintiff's life, culminating in her suffering a severe and disfiguring dog-wound, which became infected and required multiple surgeries, skin grafts, hospitalizations, and other procedures, totaling over $454,000 in medical bills, permanently altering her life.

262. Dep. Bothof's conduct was perpetrated with the intent to inflict, or with reckless disregard of the probability of inflicting, severe mental anguish on Plaintiff. By reason thereof, Plaintiff claims compensatory damages of $2,500,000, as well as punitive damages of $5,000,000 (or in an amount to be proven at trial) sufficient to punish and deter Dep. Bothof and others in similarly situated positions of authority from engaging in similar conduct in the future.

### VII. JURY DEMAND

263. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

-55-

## VIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays:

A.      That Defendants be served with a copy of this Complaint and be required to answer;

B.      That the Court find that Defendants have engaged in the conduct and statutory and common law violations alleged herein;

C.      That Plaintiff be awarded such damages as will fully compensate her for all injuries proximately caused by Defendants' actions and that a judgment in her favor be entered;

D.      That Plaintiff be awarded $2,500,000 in compensatory damages;

E.      That Plaintiff be awarded $5,000,000 in punitive damages;

F.      That Plaintiff have and recover costs for this suit, including reasonable attorneys' fees and discretionary costs, as provided by law; and

G.      That Plaintiff be awarded post-judgment interest as permitted by common law or applicable statute and such other or further relief as may be just and proper.

Respectfully submitted, this 14th day of March, 2025.

*/s/ Lance K. Baker*
Lance K. Baker, Tenn. Bar #: 032945
THE BAKER LAW FIRM
First Horizon Plaza
800 S. Gay Street, Suite 1950
Knoxville, TN 37929
Tel: 865.200.4117
Email: lance@lbakerlawfirm.com

Greg Coleman
MILBERG COLEMAN BRYSON
    PHILLIPS GROSSMAN, LLC
First Horizon Plaza
800 S. Gay Street, Suite 1100
Knoxville, Tennessee 37929
Tel: 866.252.0878
Email: gcoleman@milberg.com

-56-